**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---

GARY CISER, on behalf of himself and all
others similarly situated,

                Plaintiff,

    -against-

NESTLÉ  WATERS  NORTH  AMERICA
INC.,

                Defendant.

Civil Action No. 11-cv-5031 (WJM)

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

**LAW OFFICES OF STEVEN L. WITTELS, P.C.**

18 Half Mile Road
Armonk, New York 10504
Telephone: (914) 319-9945
Facsimile:  (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com

*Counsel for Plaintiff and the Class*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ................................ 1

   I.   THE COURT'S JANUARY 30, 2013 OPINION AND ORDER**ERROR! BOOKMARK NOT DEFIN**

   II.   THE NEW FACTUAL ALLEGATIONS IN PLAINTIFF'S SECOND
      AMENDED COMPLAINT ADDRESS ALL OF THE COURT'S
      CONCERNS................................................ **ERROR! BOOKMARK NOT DEFINED.**

      A.   Plaintiff Alleges that Defendant's Cost Attributable to a Late
            Payment is Approximately $1, if not Less....................................................4

      B.   Plaintiff Alleges that a Survey of His Relevant Market Reveals
            Defendant's Late Fee is in Most Cases 90% Greater than that of
            Comparable Companies ...............................................................................6

ARGUMENT ........................................................................................................... 4

   I.   PLAINTIFF'S SECOND AMENDED COMPLAINT SATISFIES IQBAL....................7

   II.   PLAINTIFF'S SECOND CAUSE OF ACTION TO RECOVER THAT
      PORTION OF THE LATE FEE THAT CONSTITUTES A PENALTY
      UNDER THE COMMON LAW IS WELL PLED AND STATES A
      CLAIM .........................................................................................................9

   III.   DEFENDANT'S LATE FEE IS THE POSTER CHILD FOR
       UNCONSCIONABLE PRACTICES PROHIBITED BY THE NJCFA ........................13

   IV.   PLAINTIFF HAS ADDRESSED THE COURT'S CONCERNS AND
       HAS PLEAD A PLAUSIBLE CLAIM FOR RELIEF UNDER THE
       NJCFA.......................................................................................................17

      A.   Plaintiff Ciser Pleads a Viable Theory that Defendant's Late Fee is an
            Unlawful Penalty ........................................................................................17

      B.   Nestlé Waters' Late Fee Caused Plaintiff to Suffer an "Ascertainable
            Loss" ..........................................................................................................17

   V.   DEFENDANT MISSTATES THE STANDARD FOR PLEADING A
      NJCFA CLAIM ...........................................................................................19

      A.   Plaintiff Ciser's Unconscionable Business Practice Claim Does Not
            Require an Allegation of Fraud....................................................................19

      B.   Plaintiff Need Not Plead "Substantial Aggravating Circumstances" ......................22

      C.   Plaintiff Ciser is not Challenging the Price of Nestlé Waters' Product ..................23

VI.   THE "VOLUNTARY PAYMENT" DOCTRINE DOES NOT
       FORECLOSE PLAINTIFF CISER'S CLAIMS .............................................26

       A.   The Voluntary Payment Doctrine Does Not Apply in New Jersey
            Consumer Protection Actions ...................................................................26

       B.   Application of the Voluntary Payment Doctrine Depends on Factual
            Questions that Cannot Be Decided on a Rule 12(b)(6) Motion ...............33

       C.   Allegations in the Second Amended Complaint Show that
            Defendant's Misdeeds Will not be Excused by the Voluntary
            Payment Doctrine.....................................................................................34

VII.  FED. R. CIV. P. 9(b) DOES NOT REQUIRE DISMISSAL OF
       PLAINTIFF'S NJCFA CLAIMS ...........................................................36

       A.   Rule 9(b) Does Not Apply to the NJCFA Count Because Plaintiff's
            Claims Do Not "Sound in Fraud" ............................................................37

VIII. PLAINTIFF'S THIRD CAUSE OF ACTION STATES A CLAIM FOR
       UNJUST ENRICHMENT .......................................................................39

CONCLUSION..........................................................................................  40

## PRELIMINARY STATEMENT

Plaintiff Gary Ciser asserts that Defendant Nestlé Waters North America, Inc. ("Nestlé Waters") imposes an excessive $15 late fee penalty on overdue payments owed by its customers. In its January 30, 2013 decision granting Plaintiff leave to re-file his Complaint, this Court identified two shortcomings in Mr. Ciser's earlier Complaint: (1) first, that Plaintiff's allegations did not offer enough factual detail as to the anticipated or actual costs Nestlé Waters incurs as a result of a customer's untimely monthly payment, and (2) second, that Plaintiff had not provided any factual allegations as to the late fee rates charged by other bottled water and similar-type delivery companies.  Op. 4-5, ECF No. 15.

As a result, Plaintiff filed a Second Amended Complaint on March 4, 2013 that both remedies the shortcomings identified by the Court and goes beyond what is required by Ashcroft v. Iqbal, 556 U.S. 662 (2009).  In his latest Complaint, Plaintiff sets forth more than twenty-five new or amended paragraphs detailing facts as to why Defendant's $15 late fee exceeds its actual costs by roughly $14, and specifies in a factual chart format that Nestlé Waters has a much higher late fee than any other similar bottled water delivery company. 2d Am. Compl. ¶¶ 4-8, 25-41.  With his new pleading, Plaintiff thus more than satisfies this Court's request for probative facts that support the conclusion that Nestlé's $15 late fee constitutes an unlawful penalty prohibited by the New Jersey Consumer Fraud Act (the "NJCFA") and the common law of liquidated damages.

Mr. Ciser's newly amended Complaint doesn't just stop with descriptive and robust factual allegations, however.  Plaintiff further buttresses his allegations with the cost accounting analysis of a renowned scholar at the New York University Stern School of Business, Research Professor of Accounting, Eli Bartov, PhD., C.P.A., who has experience in the field of cost accounting.  Professor Bartov examined Defendant's late fee based on the available pre-discovery

1

evidence, and concluded that the fixed $15 late fee was grossly excessive as compared to Nestlé's costs from late payments.  2d Am. Compl. ¶¶ 8, 33-34.  While Plaintiff is unaware of any rule of law requiring that an expert in the field provide supporting authority for the facts in a complaint at the pleading stage, Plaintiff nonetheless discloses his use of this expert Professor to validate his claims that Nestlé Waters' $15 late charge is an unlawful penalty.

Instead of responding to the new factually sound and expert-grounded allegations, Defendant Nestlé Waters' spends virtually its entire prolix brief ignoring the amended allegations and instead regurgitates the very same arguments for dismissal made in its first motion to dismiss; i.e., Defendant:

(1) Disputes that the NJCFA encompasses a company's late fee practices, Def.'s Br, 5-15, ECF No. 22-2, notwithstanding pronouncement from Your Honor in <u>Busse v. Homebank LLC</u>, 2009 WL 424278, at *7 (D.N.J. Feb. 18, 2009) that the CFA is marked by a "history" of "constant expansion . . . with the Act liberally construed in favor of consumers.";

(2) Drums up the inapplicable and tired voluntary payment doctrine which finds no support from Third Circuit or New Jersey case law, and instead ignores persuasive precedent from this Circuit and others that has repeatedly determined that the voluntary payment doctrine is both inapplicable at the pleading stage, and also contrary to the better reasoned case law – case law that favors vindication of consumers' rights over allowing a party to insulate its wrongful conduct from attack, Def.'s Br., 24-37; and

(3) Concocts a defense that would require Plaintiff to plead fraud even though such allegations are not required in NJCFA cases challenging unconscionable commercial practices. Def.'s Br. 21-24.

Only at the end of its scattershot brief (pp. 37-40) does Nestlé take its first stab at addressing the seminal late fee case in New Jersey, MetLife Capital Fin. Corp. v. Washington Ace. Assocs, L.P., 159 N.J. 484, (1999) – the case which this Court held in its January decision "controls in this case." Op. 4. But even this last-ditch defensive effort is fruitless, as Defendant's only arguments rest on the inadmissible and speculative opinions of its lawyers, who argue quite impermissibly that Plaintiff's cost analysis is unsound and not indicative of Nestlé's actual late-payment related costs. Def.'s Br. 15-18. Those arguments, however, are the stuff of a summary judgment motion briefed with the full benefit of discovery. As this Court noted in its January 30, 2013 decision, Plaintiff need not prove his case or show the probability of success at the pleading stage; rather, the Plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Op. 2-3 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). The Second Amended Complaint does just that. It provides the Court with verified and sound allegations of fact – which must be accepted as true at this stage of the suit – and demonstrate that the company's late fee is a profit center unrelated to the company's real costs of a late payment, and is far higher than the custom in the industry.

Further, the Court should pay short shrift to Defendant's attempt to divert attention from its own conduct by recharacterizing Plaintiff's claims as those of a dissatisfied customer, Def.'s Br. 2-12. This case isn't about a consumer who bought a service or product that proved deficient or defective. Rather it's about whether Defendant is permitted to engage in the outlawed business practice of charging customers massive late fee penalties in defiance of the law of liquidated damages and the NJCFA. That is the standard by which Defendant's conduct must be

judged.  The Court should deny Defendant's motion and allow this well–pled case to proceed to discovery.

## I.   THE NEW FACTUAL ALLEGATIONS IN PLAINTIFF'S   SECOND AMENDED COMPLAINT ADDRESS ALL OF THE COURT'S CONCERNS

The Second Amended Complaint filed on March 4, 2013 alleges that the cost Defendant might incur as a result of a late payment is approximately $1 or less, and that when compared to peer companies Defendant's late fee is higher in most cases by 90% or more.  2d Am. Compl. ¶¶ 6-7, ECF No. 20.  The Complaint first provides a summary of the claims (at ¶ 6) and then a fully detailed explanation as to how and why the late fee is excessive and violative of common law and the CFA.

### A.  Plaintiff Alleges that Defendant's Cost Attributable to a Late Payment is Approximately $1, if not Less

In an effort to provide thorough pre-discovery factual support for Plaintiff Ciser's allegations, Plaintiff retained a noted scholar at the New York University Stern School of Business, Research Professor of Accounting, Eli Bartov, PhD., C.P.A., who has experience in the field of cost accounting. Professor Bartov evaluated Defendant's late fee, and provides sound support for Plaintiff's allegations that the anticipated or actual costs that Defendant Nestlé Waters incurs as a result of untimely payments consist of two components: (a) its own borrowing costs for the time Nestlé has to carry the overdue balance until paid, and (b) any incremental administrative costs the Company bears for its extra effort made to collect the late payment, e.g. mailing collection letters (if any) to past due customers.  2d Am. Compl. ¶ 5.  Collection costs are excluded because Nestlé Waters recoups those costs by charging costs apart from, and in addition to, the late fee.  See id.  ¶ 22 (quoting invoice, "[a]dditional third party collection/attorney expenses may be assessed at a rate not to exceed 100% of the unpaid balance or the maximum allowed by law").

Concerning carrying costs, the Second Amended Complaint alleges that Defendant typically incurs less than 25 cents in interest carrying cost for the relatively short time period between the due date and the date an overdue payment is received.  Id. ¶ 32.  In order to illustrate Defendant's interest carrying costs, the Second Amended Complaint describes the circumstances of the $15 late fee Mr. Ciser was charged for his overdue payment of $51.96 made on March 6, 2007.  Id. ¶ 33.  Plaintiff Ciser's payment was 33 days overdue, and based on Nestlé's publically available interest costs, Professor Bartov calculated that Nestlé Waters' interest cost for this payment amounts to **approximately 14 cents**.  Id.

Concerning incremental administrative expenses, the Second Amended Complaint again uses the March 6, 2007 overdue payment to illustrate Defendant's minimal late-payment related incremental administrative costs.  Id. ¶ 34.  The Second Amended complaint alleges that the only step Nestlé took to collect the late payment was to include a message at the top of Plaintiff Ciser's next monthly bill asking its customer "Did you forget about us?" and reminding him that "past due accounts are subject to a late fee."  Id.  Defendant did not send a collection letter because Defendant did not begin sending collection letters to customers until 2009.  Id. ¶ 6.  Even if it had sent a collection letter, however, Professor Bartov found that if one allows for the cost of a collection letter (at approximately $1), the total financial cost to Nestlé Waters from Plaintiff's March 6, 2007 payment was $1.14.  Id. ¶ 34.  Defendant's $15 late fee was therefore approximately 900% above the actual damage Nestlé suffered as a result of the March 6, 2007 overdue payment.  Id.

Moreover, the Second Amended Complaint alleges two additional facts to support Plaintiff's allegation that Defendant's late fees are intended as a penalty to coerce payment, rather than to reimburse Defendant for the estimated or actual costs of a late payment.  First, Plaintiff Ciser contrasts the $15 late fee with Defendant's Fuel Surcharge, which varies depending upon the

5

monthly national U.S. average for diesel fuel reported to the U.S. Department of Energy.  Id. ¶ 37.  According to Plaintiff Ciser, if Defendant wanted to recoup a true measure of its interest carrying costs, it would have varied its late fee so as to reflect the change in interest rates, which during the period of 2008 to the present have declined significantly.  Id.  Defendant, however, charged Plaintiff Ciser a uniform $15 for all late fees from approximately October 2006 to May 2009.  Id.

Second, Plaintiff Ciser alleges that Defendant failed to undertake any type of study or analysis to determine what its anticipated costs would be from a late payment, which, according to Plaintiff Ciser reveals that the Company's $15 charge is arbitrary and intended as a penalty to coerce payment, rather than to reimburse Defendant for estimated or actual costs of a late payment. Id. ¶ 6.

### B. Plaintiff Alleges that a Survey of His Relevant Market Reveals Defendant's Late Fee is in Most Cases 90% Greater than that of Comparable Companies

In order to show that Defendant's late fee is far beyond the boundaries of late charge rates customarily utilized by other bottled water and similar-type delivery companies, counsel for Plaintiff Ciser surveyed 12 companies that sell to New Jersey consumers.  Id. ¶ 39.  The results of that survey show that the more usual fixed late fee of other bottled water delivery companies is substantially lower than Nestlé's, either zero, 1%, $10 or 10%.   Id. ¶ 41.  No other company charges a flat $15 late fee.  Id.

Accordingly, and in light of the forgoing, Plaintiff Ciser sets forth facts to support his allegation that Defendant's $15 late fee bears no rational relationship to the relatively small interest/administrative costs the Company incurs from late payments.   Further, Plaintiff adequately alleges that Defendant's late fee is abnormally higher than industry rates in the bottled water field or in comparable consumer companies.

## ARGUMENT

**I.    PLAINTIFF'S SECOND AMENDED COMPLAINT SATISFIES IQBAL**

To survive dismissal for failure to state a claim under Ashcroft v. Iqbal, 556 U.S. 662 (2009), "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." As this Court noted in granting Plaintiff leave to replead, on a 12(b)(6) motion, while "a court must take all allegations in the complaint as true and view them in the light most favorable to the Plaintiff," the "assumption of truth is inapplicable, however, to legal conclusions couched as factual allegations." Op. 2.

Here, the detailed factual allegations in the Second Amended Complaint clearly indicate the basis for Plaintiff's claim that Defendant's late fee constitutes an unlawful penalty. The Second Amended Complaint alleges (1) that the cost Defendant must incur as a result of a late payment is approximately $1, and perhaps less, and (2) when compared to peer companies Defendant's $15 late fee is higher in most cases by 90% or more. 2d Am. Compl. ¶¶ 6-7. Plaintiff further alleges that Defendant assesses a $15 late fee no matter how large the late fee is relative to the overdue payment, or how many days overdue the payment might be. Id. ¶ 3. Plaintiff alleges that he was charged the $15 late fee on five occasions and that on one occasion the $15 late fee was **132.62%** of the amount Plaintiff owed. Id. ¶ 26. These allegations are not mere "threadbare recitals of the elements of a cause of action." Iqbal, 556 U.S. at 678. Rather, they are the facts that show Plaintiff Ciser's entitlement to relief. Fowler v. UPMC Shadyside, 578 F.3d 203, 2101 (3d Cir. 2009) (citing Phillips v. County of Allegheny, 515 F.3d 224, 234–35 (3d Cir. 2008)).

Moreover, the Second Amended Complaint relies not only on the above-mentioned facts, but it goes further and sets forth Plaintiff's basis for these allegations. First, concerning the size of Nestlé Waters' late fee relative to that of comparable companies, the Second Amended Complaint surveys the late fees charged by other bottled water and delivery companies. 2d Am.

Compl. ¶ 39.  That survey reveals that comparable companies charge late fees that are substantially lower than Defendant's, either zero, 1%, $10 or 10%.  Id. ¶ 40.   The Second Amended Complaint also alleges that investigation by Plaintiff's counsel could not find any bottled water delivery company that charged as much as the fixed $15 late fee charged by Defendant.  Id. ¶ 38.

Second, concerning the cost Defendant must incur as a result of a late payment, Plaintiff Ciser consulted a noted business professor and alleges that Defendant's actual or anticipated costs as a result of untimely payments consist of Defendant's carrying costs and incremental administrative costs.  Id. ¶ 5.  Contrary to Defendant's contention, Defendant's collection costs cannot be included, as those costs are recuperated by charges assessed in addition to the $15 late fee. Id. ¶ 22.

Plaintiff then analyzes the his overdue payment of $51.96 made on March 6, 2007 and alleged that the total financial cost to Nestlé Waters from this late payment was, at most, $1.14.  Id. ¶ 34.  As a result, Plaintiff Ciser concluded that Defendant's $15 late fee was approximately 900% above the actual damage suffered by Nestlé as a result of the March 6, 2007 overdue payment. Id.  Plaintiff Ciser further alleges that, in contrast to Defendant's Fuel Surcharge, the $15 late fee does not very depending on Defendant's actual costs, and Defendant failed to undertake a study or analysis to determine what its anticipated costs would be from a late payment.  Id. ¶¶ 6, 37.

These allegations must be taken as true and the Court must view them in the light most favorable to Plaintiff.  See Warth v. Seldin, 422 U.S. 490, 501 (1975); Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir. 1998).  When so viewed, none of the pertinent facts provide a basis for Nestlé Waters to charge Plaintiff Ciser a $15 late fee irrespective of how large the late fee percentage is relative to the overdue payment, or how many days overdue the payment might be.  Accordingly, Plaintiff has set forth the "factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

## II.   PLAINTIFF'S SECOND CAUSE OF ACTION TO RECOVER THAT PORTION OF THE LATE FEE THAT CONSTITUTES A PENALTY UNDER THE COMMON LAW IS WELL PLED AND STATES A CLAIM

New Jersey precedent forbids the use of contractual penalties.   In Wasserman's Inc. v. Township of Middletown, 137 N.J. 238 (1994), the New Jersey Supreme Court quoted with approval the rule articulated by the Second Restatement of Contracts, section 356(1), which outlaws the contractual provision of a penalty:

> Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss.  A term fixing unreasonably large liquidated damages is unenforceable on grounds of **public policy as a penalty**.

(Emphasis added).

Wasserman's further noted "**we are sensitive to the possibility that, as their history discloses, such clauses may be unconscionable and unjust**." Id. at 253-54 (emphasis added).

Wasserman's saw the New Jersey Supreme Court remand for trial court fact-finding as to whether a lease default clause was an enforceable liquidated damages or an illegal penalty.   The term in question stipulated that the landlord would pay 25% of the lessee's average gross receipts for one year in the event the landlord cancelled the lease.

The Supreme Court pointed out that "for more than five centuries" courts have scrutinized contractual terms that specify damages in the event of breach." Id. at 248.  "As the law has evolved, a stipulated damage clause must constitute a reasonable forecast of the probable injury resulting from a breach; otherwise, the clause will be unenforceable as a penalty, and the non-breaching party will be limited to conventional damage measures." Id. at 249.

Wasserman's then made two critical pronouncements which are of dispositive importance to Defendant's motion.  First, the Court stressed that if there is any doubt, a contractual provision should be construed as an outlawed penalty and not allowable liquidated damages.  Id. at 451.[1]  Second, while "the decision whether a liquidated damages clause is enforceable is a question of law for the court it may require resolution of underling factual issues."  Id. (citing Highgate Association Ltd. v. Merryfield, 157 Vt. 313, 316 (Vt. 1991) ("While enforceability of liquidated damages provisions is a question of law, the trial court must make a tripartite inquiry which requires the resolution of questions of fact.").[2]

Wasserman's was followed by the MetLife decision. 159 N.J. 484 (1999).  MetLife upheld the trial court's finding that a 5% late fee contained in a multi-million dollar commercial mortgage loan agreement was reasonable liquidated damages and not an unlawful penalty.

MetLife articulated the following test for the enforceability of a late fee:

**The overall single test of validity is whether the stipulated damage clause is reasonable under the totality of the circumstances.**

Id. at 496.

Among the factors entering into the reasonableness inquiry are:

(1) Industry Standards - how does the challenged late charge compare to late fees employed in the same business?: and

(2) A factual analysis of the defendant's operational costs resulting from untimely payments.  This analysis will require presentation of evidence and a hearing.

---

[1] Citing The Monmouth Park Association v. The Wallis Ironworks, 3 N.J.L. 132 (Court of Appeal and Errors 1892) ("And if it be doubtful on the whole agreement whether the sum is intended as a penalty or as liquidated damages, it will be construed as a penalty because the law favors mere indemnity."); Westmount Country Club v. Kameny, 82 N.J. Super. 200, 206 (App. Div. N.J. 1964).

[2] VanEs v. Honeyleaf Properties. Inc., 253 N.J. Super. 566, 568-69 (App. Div. N.J. 1992) (Appellate Division overturned Superior Court's grant of summary judgment on the issue whether 15 percent liquidated damages amount represented a forecast of damages in the event of breach. The court held that it was improper to grant summary judgment prior to the completion of discovery.)

In applying this test, the <u>MetLife</u> court struggled to find a relatively low 5% charge at issue there was not an "unusually large percentage[] or explicit evidence of a coercive intent." <u>Id.</u> at 499.  **<u>MetLife</u> cited <u>Garcia v. Canan</u>, 851 F. Supp. 327, 328 (N.D. Ill. 1994), which dealt with a 10% late fee, as representing an "unusually high" charge and therefore qualifying as an unenforceable penalty**.

<u>MetLife</u> then held that the that the 5% late fee was only appropriate because there was uncontroverted testimony that the five percent late fee was well within the normal industry standard and it had been negotiated by "sophisticated commercial entities."  The court, however, was careful to clarify that its approval of a 5% figure negotiated by sophisticated parties "does not address the issue of enforceability of liquidated damage clauses in consumer contracts or in residential mortgages."  <u>Id.</u> at 502, n.2.

If a 10% late fee negotiated by sophisticated parties is "unusually large," and a 5% late fee is only valid if between sophisticated parties, <u>MetLife</u>, 159 N.J. at 499, then what are we to make of the late fees, sometimes as high as **132%** Defendant Nestlé Waters imposes on New Jersey consumers?  It is an unlawful penalty.  <u>See also</u> <u>New York Career Guidance Services, Inc. v. Wells Fargo Fin. Leasing, Inc.</u>, BER-L-1705-03, 2005 WL 1252315, at *6 (N.J. Super. Ct. Law Div. May 2, 2005) (expressing "grave doubts" that a late charge in a commercial environment of more than 90% of the late payment is reasonable and refusing to dismiss plaintiffs' cause of action for unlawful liquidated damages.).

Defendant's contentions to the contrary do not change this fact.  Nestlé Waters argues that Plaintiff cannot maintain a common law penalty claim because such a claim is a defense, and not an affirmative cause of action.  Def.'s Br. at 37.  That argument, however, is devoid of proper legal support.  First, it ignores the fact that **<u>Every</u>** United States jurisdiction and indeed,

other common law judicial systems, such as Ireland, England, New Zealand, Scotland, and Canada refuse to enforce damage terms so high as to be considered a penalty.[3]

---

[3] Taylor v. Sandiford, 20 U.S. 13, 15(1822) (Marshall, J.); Garrett v. Coast and Southern Federal Savings and Loan Association, 9 Cal. 3d. 731 (1973); Beasley v. Wells Fargo Bank, N.A., 1 Cal. Rptr. 2d 446 (Ct. App. 1991); Brenner v. Little Red Schoolhouse, Ltd., 302 N.C. 207, 214 (1981); The Wheeling Clinic v. Van Pelt, 192 W. Va. 620, 624 (1994); Highgate Association v. Merryfield, 157 Vt. 313, 316 (1991); Gary Outdoor Advertising Co. v. Sun Lodge, Inc., 133 Ariz. 240, 243 (1982); SP Terrace, L.P. v. Meritage Homes of Texas, LLC, 334 S.W.3d 275, 287 (Tex. App. 2010); Benya v. Gamble, 321 S.E. 2d 57 (S.C. App. 1984); Norman v. Durham, 380 S.W.2d 296, 304 (Mo. 1964)).

See further: Frank v. Jansen, 303 Minn. 86, 90-91, (1975); Man O War Restaurants, Inc. v. John Martin, 932 S.W.2d 366, 369 (Ky. 1996); Koeing v. Schlitz Breweries, 126 Wis. 349, 368  (1985); Shallow Brook Associates v. Dube, 135 N.H. 40, 48-49 (1991); Pacheo v. Scoblinko, 532 A.2d 1036, 1038, 1039 (Me. 1987); Council v. Hogan, 566 A.2d 1070, 1072 (D.C. App. 1989); Colby v. Bailey, 5 Haw. 152, 153 (1884); Kona v. Pac Group, 680 F. Supp. 1438 (D. Haw. 1988); Kalenka v. Taylor, 896 P.2d 222, 229 (Alaska 1995); United States School District 315 v. DeWerff, 6 Kan. App. 2d 77, 81, (1981); Rohauer v. Little, 736 P.2d 403, 410 (Col. 1987).

See further: Zito v. Goaude, 122 R.I. 886 (1979); Atlantic Aviation v. Provident Life and Accident Insurance Co., 1989 WL 101469 (D. Del. 1989); Worley v. McCarty, 354 Mich. 599 (1958); Camelot Music, Inc. v. Mars Reality and Improve. Co., 514 So. 2d 987 (Ala. 1987); Lane v. Pfeifer, 568 S.W.2d 212 (Ark. 1978); 301 Dahlgren Ltd. v. Board of Supervisors, 240 Va. 200, 201 (1990).

See further: AFLAC, Inc v. Williams, 265 Ga. 351, 354, (1994); Coffman v. Olson & Co., P.C., 906 N.E.2d 201, 210 (Ind. Ct. App. 2009); Crown Linen Serv., Inc. v. Apple E. of Danbury, Inc., 2008 WL 1971317, at *2 (Conn. Super. Ct. Apr. 15, 2008); Harmon v. Eggers, 699 S.W.2d 159 163 (Tenn. 1985); Lombardo v. Deshote, 647 So. 2d 1086, 1081 (La. 1994) (Applying Civil Code).

See further: Walter Implement, Inc., v. Focht, 107 Wash 553 (1987); Woodhaven Apartments v. Washington, 942 P.2d 918 (Utah 1997); Phillips v. Phillips, 820 S.W.2d 785 (Tex. 1991); Transocean Enter., Inc. v. Ingalls Shipbuilding, Inc., 33 So. 3d 459, 468 (Miss. 2010), reh'g denied (May 13, 2010), cert. denied, 131 S. Ct. 473 (2010); Lake Ridge Academy v. Carney, 613 N.E.2d 183, 188 (Ohio 1993); Illingwroth v. Bushong, 297 Or. 675 (1984); Fischer v Schmeling, 520 N.W.2d 820, 822 (N.D. 1994); Story v. City of Bozeman, 259 Mont. 207, 227 (1993); Kushan v. Strong, 39 N.M. 281 (1935); Graves v. Cupic, 75 Idaho 451 (1954); Massey v. Love, 478 P.2d 948 (Okla. 1979); Rohlin Construction Co. v. Hintoy, 476 S.W.2d 78 (Iowa 1991); Loomis v. Lange Fin. Corp., 109 Nev. 1121 (1993); Maxey v. Glindmeyer, 379 So. 2d 297, 301 (Miss. 1980); Abel Construction Co. v. Seward, 188 Neb. 166 (1972); Weber v. Broady, 255 Mo. 195 (1914); Jessen v. Jessen, 871 P.2d 987 (Wyo. 1991).

See the following foreign, common law jurisdictions demarcating between liquidated damages clause and a disproportionately high and unenforceable penalty: 370-341 Ontario Ltd. v. Mikhalin, 1996 O.T.C. LEXIS 3913, at *14 (Ontario Court of Justice 1996); Hart Ltd v. Mitchell, 1996 S.C.L.P.R. 68 (Sheriff Court, Glasgow, Scotland Oct. 30, 1995); Lordsvale v. Bank of Zambia, 30 E.R. 165 (Queens' Bench 1996); Schiesser International v. Gallager, 106 I.L.T.R. 22 (Ireland 1971); General Finance Acceptance Ltd. v. Melrose, 1 N.Z.L.P.R. 465 (High Court Auckland 1987).

Second, Defendant cannot cite a single New Jersey case holding that a common law penalty claim cannot provide a foundation for affirmative relief.  Instead, Defendant relies on out-of-state cases that do not apply New Jersey law and ignores the several applicable cases that allow consumers to bring suit to recover unlawful penalties.  See e.g. New York Career Guidance Services, 2005 WL 1252315, at *6; see also id. 2006 WL 224000, at *9 (Jan. 27, 2006) (approving class action settlement of "conventional" affirmative common law claim); King's Choice Neckwear, Inc. v. Fedex Corp., No. 07-CV-0275 (DMC), 2007 WL 4554220, at *6-7 (D.N.J. Dec. 21, 2007); Garrett v. Coast and Southern Federal Savings and Loan Association, 9 Cal. 3d. 731 (1973); Beasley v. Wells Fargo Bank, N.A., 1 Cal. Rptr. 2d 446 (Ct. App. 1991).  Accordingly, this Court should not dismiss Plaintiff Ciser's common law penalty claim on the grounds New Jersey does not provide for affirmative relief.

## III.   DEFENDANT'S LATE FEE IS THE POSTER CHILD FOR UNCONSCIONABLE PRACTICES PROHIBITED BY THE NJCFA

Exorbitant late fees are a trap for consumers, often misused by companies not to recoup their actual or anticipated losses from late payments, but rather as a club over customers' heads to boost the bottom line.  As we have shown in our case law survey of the liquidated damages landscape above, no state law permits a penalty, and there are many reported cases allowing consumers to challenge penalty clauses similar to Nestlé's.  In like vein, excessive late fees are illegal penalties also prohibited by the NJCFA's broad consumer protections.

As this Court has noted:

The NJCFA is one of the strongest consumer protection statutes in the country. Cox v. Sears Roebuck & Co., 138 N.J. 2, 15 (1994).  The statute seeks to protect consumers by "eliminating sharp practices and dealing in the marketing of merchandise and real estate." Channel Cos. v. Britton, 167 N.J.Super. 417, 418 (App. Div. 1979) (citations omitted).  The history of the NJCFA has been one of "constant expansion," Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604,

(1997), with the Act liberally construed in favor of consumers, Cox, 138 N.J. at 14.

Busse v. Homebank LLC, No. 2:07–CV–03495 (WJM), 2009 WL 424278, at *7 (D.N.J. Feb. 18, 2009) (Martini, J.).  Accordingly, "a court adjudicating a NJCFA claim must approach dismissal of said claim 'with hesitation,'" Stewart v. Smart Balance, Inc., No. 11-6174 (JLL), 2012 WL 4168584, at *7 (D.N.J. June 26, 2012) (quoting New Jersey Citizen Action v. Schering–Plough Corp., 367 N.J. Super. 8, 13, (App. Div. 2003)).

In order to state a claim under the NJCFA, a plaintiff must allege (1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss.  Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., 192 N.J. 372, 389 (2007).  The NJCFA defines unlawful conduct as follows:

> **[t]he act, use or employment by any person of any unconscionable commercial practice**, deception fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, **in connection with the sale or advertisement of any merchandise or real estate, _or with the subsequent performance of such person as aforesaid_, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice**....

N.J.S.A 56:8–2 (emphasis added).

Plaintiff Ciser's Second Amended Complaint alleges that Nestlé Waters' late fee is an unlawful "unconscionable commercial practice" because the late fee is not for the purpose of offsetting the marginal cost of a late payment, but rather to enrich Defendant at the expense of unsuspecting consumers.  2d Am. Compl. ¶¶ 9, 51-54, ECF No. 20.

Unconscionability under the NJCFA has been defined as "an amorphous concept obviously designed to establish a broad business ethic," Cox, 138 N.J. at 18, which "must be interpreted liberally so as to effectuate the public purpose of the NJCFA."  Assoc. Home Equity

Serv., Inc. v. Troup, 343 N.J. Super. 254, 278 (App. Div. 2001).  The New Jersey Supreme Court has held that the term "unconscionable" codifies "the standard of conduct contemplating good faith, honesty in fact and observance of fair dealing."   Meshinsky v. Nichols Yacht Sales, Inc., 110 NJ 464, 472 (1988) (internal quotation marks and alterations omitted).   In outlining this broad standard, the New Jersey Supreme Court "anticipated that courts would 'pour content' into the concept on a case-by-case basis."  Id.; see also Lemelledo v. Beneficial Mgmt., 150 N.J. 255, 265 (1997) ("Given that the fertility of human invention in devising new schemes of fraud is so great, the NJCFA could not possibly enumerate all, or even most, of the areas and practices that it covers without severely retarding its broad remedial power to root out fraud in its myriad, nefarious manifestations.") (internal quotation marks, citations and alterations omitted).

As a result, courts have found a litany of unsavory business practices to be actionable under the NJCFA's prohibition of unconscionable business practices.  See Korrow v Aaron's, Inc., No. 10–6317 (JAP), 2011 WL 3794231, at *3 (D.N.J. Aug. 25, 2011) (interest, charges and fees); see also Cowger v Cherry Hill Mitsubishi, Inc., A-3408-09T4, 2011 WL 848133, at *4 (N.J. Super. Ct. App. Div. Mar. 14, 2011) ("The undisputed facts leave no doubt that defendant engaged in an unconscionable commercial practice by holding plaintiff's deposit for so long.  It was undisputed that defendant held the deposit for twenty-four days, an unreasonable period of time in these circumstances."); Assoc. Home Equity Serv., Inc. v. Troup, 343 N.J. Super. 254, 264 (App. Div. 2001) (home improvement loan terms); Pollitt v. DRS Towing, LLC, No. 10-1285 (AET), 2011 WL 1466378, at *6 (D.N.J. Apr. 18, 2011) (cost of impounding car); Mathiesen v. Moleski, A-0365-10T3, 2011 WL 3516927, at *10 (N.J. Super. Ct. App. Div. Aug. 12, 2011) (acts intended to cajole debtor to pay for disputed services); Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 538 (App. Div. 2008) (loan collection); Hughes v. TD Bank, N.A.,

856 F Supp 2d 673, 680-81 (D.N.J. 2012) (reordering debit card transactions to increase fees); Garsh v. Wells Fargo Bank, N.A., No. 11-21543 (MBK), 2012 WL 1207220, at *8 (Bankr. D.N.J. Apr. 9, 2012) (failure to consider plaintiffs' ability to repay loan before extending credit); Katz v. Live Nation, Inc., No. 09-3740 (MLC), 2010 WL 2539686, at *6 (D.N.J. June 17, 2010) (uniformly charging ticket holders for parking spaces without ascertaining their mode of transportation "indicate[s] a capacity to mislead consumers and evince[s] a lack of fair dealing.").[4]

Given the wide net of offensive conduct which courts find encompassed by the CFA, it is therefore no surprise that courts in this state have also held that excessive late fees constitute actionable unconscionable commercial practices.   In King's Choice Neckwear, Inc. v. Fedex Corp., Judge Cavavaugh held that the plaintiff's allegation of a nearly forty-percent late fee was "an unjust and unconscionable commercial practice actionable under the NJCFA."  No. 07-CV-0275 (DMC), 2007 WL 4554220, at *6-7 (D.N.J. Dec. 21, 2007).   In so finding, Judge Cavavaugh relied on Wasserman's and MetLife.  Judge Cavavaugh reasoned:

> MetLife articulated a test for the enforceability of a late fee: "The overall single test for validity is whether the stipulated damage clause is reasonable under the totality of the circumstances." Id. at 496.  The test considered reasonableness factors, such as industry standards and a factual analysis of the defendant's operational costs resulting from untimely payments.   MetLife was careful to distinguish between a relatively low, enforceable late fee, like the five-percent charge allowed there, and "unusually large percentages or explicit evidence of a coercive intent." Id. at 499.  MetLife cited Garcia v. Canan, which dealt with a ten-percent late fee as representing an "unsually high" charge and, therefore, qualifying as an unenforceable penalty.  See 851 F. Supp. 327, 328 (N.D.Ill. 1994).   A ten-percent late fee is "unusually large." MetLife, 159 N.J. at 499. **Thus, the nearly forty-percent collection fee that AFG received from Plaintiff is certainly exorbitant and, therefore, unenforceable.**

---

[4] See also Troup, 343 N.J. Super. at 278-79; and Gonzalez v. Wilshire Credit Corp., 411 N.J. Super. 582, 592 (App. Div. 2010) aff'd, 207 N.J. 557 (2011), (question of whether a practice is unconscionable under the NJCFA is left to the factfinder).

<u>King's Choice</u>, No. 07-CV-0275 (DMC), 2007 WL 4554220, at *7 (emphasis added)

Similarly, other New Jersey courts have followed <u>Wasserman's</u> and <u>MetLife</u> in holding

that the NJCFA prohibits excessive late fees:

> [T]he math does not lie: the equivalent interest rate of a $50.00 late fee on a
> $53.64 installment is greater than 90%.  This is enough to survive summary
> judgment by strongly suggesting that the presumption of reasonableness is likely
> to be overcome at trial.  Given the struggle of the Supreme Court of New Jersey
> to justify the 5% late charge in <u>MetLife</u>, the late charge here of almost twenty
> times that percentage may not pass muster.  I have grave doubts that a late charge
> in a commercial environment of more than 90% of the late payment is reasonable.
> The NJCFA claim remains viable together with the common law and unjust
> enrichment theories of liability found in Counts 1, 2, and 3.  To the extent that
> Leasing seeks dismissal of those counts, its motion is denied.

<u>New York Career Guidance Services, Inc. v. Wells Fargo Fin. Leasing, Inc.</u>, BER-L-

1705-03, 2005 WL 1252315, at *6 (N.J. Super. Ct. Law Div. May 2, 2005).  <u>Kings Choice</u> and

<u>New York Career Guidance Services</u> are directly on point.   Exorbitant late fees are

unconscionable commercial practices proscribed as unlawful by the NJCFA.

## IV.   PLAINTIFF HAS ADDRESSED THE COURT'S CONCERNS AND HAS PLEAD A PLAUSIBLE CLAIM FOR RELIEF UNDER THE NJCFA

**(Responding to Def.'s Br. pp. 15-21)**

### A. Plaintiff Ciser Pleads a Viable Theory that Defendant's Late Fee is an Unlawful Penalty

In light of Plaintiff's new allegations, there can be no doubt that the Second Amended

Complaint pleads a viable cause of action under the NJCFA.  Plaintiff alleges that Defendant's

late fee is an "unconscionable commercial practice" and sets forth both a theory explaining why

those practices are unconscionable as well as the factual allegations underlying that theory.

### B. Nestlé Waters' Late Fee Caused Plaintiff to Suffer an "Ascertainable Loss"

17

As this Court held in its January decision, Plaintiff "Ciser incurred an ascertainable loss when he paid allegedly unenforceable late fees. Op 3-4.  Second, Ciser "alleges causation." Id., citing Barrows v. Chase Manhattan Mortg. Corp., 465 Supp. 2d 347, 360-61 (D.N.J. 2006). There can thus be no reasonable ground to gainsay Plaintiff's renewed allegations that he was charged and paid a penalty, as detailed in the chart showing payment of late fees ranging from 28% to 132% of the overdue amount.  See e.g., 2d Am. Compl. ¶¶ 25-28, 52-55.   But for Defendant's unconscionable late fee provision, Plaintiff would never have paid Defendant the $75 in late fees demanded.  Plaintiff thus satisfies the second and third elements of a NJCFA claim for alleging unconscionable business practices.

Defendant's distorted reading of NJCFA case law on causation cannot alter the soundness of the Complaint.  Contrary to Nestlé Waters' contention, it is irrelevant whether the late fee "induce[d] the purchase of [Defendant's] product."  Def.'s Br. 13-14.  In rejecting this argument, the courts hold "[u]nlike fraudulent misrepresentation claims, unconscionable commercial practices need not induce the purchase, given that the Act also targets 'the subsequent performance.'"  Pollitt v. DRS Towing, LLC, CIV. 10-1285 AET, 2011 WL 1466378, at *7 (D.N.J. Apr. 18, 2011) (quoting New Mea Constr. Corp. v. Harper, 203 N.J. Super. 486, 499 (App. Div. 1985)); see also D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. 11, 25 (App. Div. 1985) (unconscionable commercial conduct under the NJCFA "is not limited to the initial transaction but extends to 'the subsequent performance of such person [involved in the transaction].'")  (alteration in original) (quoting N.J.S.A. 56:8–2).

None of the cases cited by Defendant suggest the contrary.  Def.'s Br. 13-15.   Indeed, they do not even address unconscionable practices, as Nestlé Waters only cites cases that involve representations and/or omissions, as follows:  Dist. 1199P Health and Welfare Plan v. Janssen,

L.P., 784 F Supp 2d 508, 530 (D.N.J. 2011) (fraudulent promotion of Risperdal for off-label uses); Debra F. Fink, D.M.D., MS, PC v. Ricoh Corp., 365 NJ Super 520, 532-34, (Law Div. 2003) (deceptive advertising of cameras); Carroll v. Cellco Partnership, 313 NJ Super 488, 491-92 (App. Div. 1998) (deceptive advertising of cell phones); McKenna v. Bank of Am., No. 10-1848 (JAP), 2010 WL 2985643, at *3 (D.N.J. July 26, 2010) ("McKenna does not state which specific provision or provisions of the NJCFA were violated; however, upon reviewing the NJCFA, it appears that McKenna is attempting to state a claim under N.J.S.A. 56:8-2 – Fraud."); Cole v. Laughrey Funeral Home, 376 NJ Super 135, 142 (App. Div. 2005) (misrepresentations regarding condition of corpse); Joe Hand Promotions, Inc. v. Mills, 567 F. Supp. 2d 719, 724 (D.N.J. 2008) (fraud in a demand letter).[5]

## V.    DEFENDANT MISSTATES THE STANDARDS FOR PLEADING A NJCFA CLAIM

### A. Plaintiff Ciser's Unconscionable Business Practice Claim Does Not Require an Allegation of Fraud

**(Responding to Def.'s Br, pp. 7-10, 22-23)**

Nestlé Waters' exorbitant late-payment penalty constitutes an independently actionable unlawful practice. Plaintiff Ciser is not required to plead an affirmative fraudulent statement, as this mistaken view has been repeatedly rejected by courts. See Meshinsky v. Nichols Yacht Sales, Inc., ("it is not necessary to show actual deceit or a fraudulent act; any unconscionable commercial practice is prohibited.") 110 NJ 464, 472 (1988); In re NorVergence, Inc., 424 BR

---

[5] Joe Hand's viability is also questionable. McNeary-Calloway v. JP Morgan Chase Bank, N.A., 863 F Supp 2d 928, 963 (N.D. Cal. 2012) ("This Court, however, can find no court that has since followed Joe Hand's reading of the NJCFA requirements. Rather, the decision appears contrary to the New Jersey Supreme Court's holdings that the NJCFA 'does not require proof of reliance.' Lee v. Carter–Reed, 203 N.J. 496, 522, 4 A.3d 561 (2010) (quoting Gennari v. Weichert Co. Realtors, 148 N.J. 582, 607, 691 A.2d 350 (1997))").

663, 689 (Bankr. D.N.J. 2010) ("As this Court has already noted on a prior occasion, [] a defendant may be liable under the NJCFA as a result of engaging in an 'unconscionable commercial practice,' without also engaging in an act of fraud.").

Katz v. Live Nation, Inc., is instructive.  No. 09-3740 (MLC), 2010 WL 2539686 at *6 (D.N.J. June 17, 2010).   There, Live Nation was accused of committing an unconscionable business practice by charging parking fees to all ticket holders despite maintaining fewer parking spaces than the venue's capacity for events.  Id.   Similar to Nestlé Waters, Live Nation demanded dismissal of the Katz plaintiffs' claims because "unconscionable practices must contain some form of deception or misrepresentation to make them actionable under the NJCFA."  Id.  Judge Cooper, however, was not persuaded:

> We find that Defendants err in their assertion that New Jersey law does not recognize a stand-alone claim for unconscionable commercial practice.  Under the NJCFA, unlawful affirmative acts consist of *unconscionable commercial practice*, fraud, deception, false promise, false pretense, and misrepresentation.  NJCFA claims for unconscionable commercial practice need not allege an affirmative fraudulent statement, representation, or omission by the defendant.

Id. at *5 (emphasis in original) (internal quotation marks, citations and alterations omitted); see also Dewey v. Volkswagen AG, 558 F. Supp. 2d 505, 525 (D.N.J. 2008) (enforcing NJCFA's prohibition against "unconscionable commercial practices" without requiring a showing of fraud, misrepresentation, or deception, inducement or reliance).  Indeed, "[a] practice can violate the Act even though no one was misled or deceived as a result."  Byrne v. Weichert Realtors, 290 N.J Super. 126, 136 (App. Div. 1996) (citing Cox v Sears Roebuck & Co.).

The inapposite cases on which Nestlé Waters relies does not change this fact.  Def.'s Br. 7-8.  Their inapplicability to Defendant's late fee claims has already been presaged by Judge Cooper's analysis in Katz:

"[The] cases cited by Defendants in an attempt to impose a more exacting
standard for unconscionable business practice claims under the NJCFA are
inapposite here.  In Island Mortg. of N.J. v. 3M, 373 N.J.Super. 172, (N.J. App.
Div. 2004), the court dismissed a claim where there was "no allegation that
suggests defendant had any direct contact with any consumer in plaintiffs' class."
Sickles v. Cabot Corp., 379 N.J.Super. 100 (N.J. App. Div. 2005), also cited by
Defendants, involved a purchaser of tires who brought NJCFA claims against
companies which produce, manufacture, and sell carbon black, a primary
ingredient in tires.  At issue in that case was whether "an *indirect* purchaser of an
allegedly price-fixed product may state a claim for antitrust violations under the
New Jersey Antitrust Act" and NJCFA.  Sickles, 877 A.2d at 269. [] Here, in
contrast, tickets to events at the Arts Center are contracts to which the ticket
holder and Defendants are the parties; the relationship between the putative class
members and Defendants is a direct one, and the Complaint alleges more than
mere "alleged monopolistic conduct" as the basis for the NJCFA claims. Island
Mortg., 860 A.2d at 1016.

Katz, No. 09-3740 (MLC), 2010 WL 2539686 at *6, n.2.

Defendant's reliance on Wilson v. Gen. Motors Corp., is similarly unavailing, as Wilson

followed Sickles and Island Mortgage in declining "to create an 'end run' around the plain

intention of the Legislature embodied in the Antitrust Act."  A-0943-03T5, 2006 WL 1767754,

at *9 (N.J. Super. Ct. App. Div. June 29, 2006).

Palmucci v. Brunswick Corp., also does not help Nestlé Waters, as Defendant's desperate

reading of the word "equate" is a red herring.  311 NJ Super 607, 617 (App. Div. 1998).

Defendant cites Palmucci for the proposition that "unconscionability equates with fraud and

deception."  Def.'s Br. 7.  The language Defendant lifted from Palmucci is from Kugler v.

Romain 58 N.J. 522 (1971).  Kugler, however, clearly holds that unconscionable commercial

practices are distinct from fraud and do not require deception.  Kugler concerned whether door-

to-door marketing of books priced in a manner that was "grossly excessive in relation to the

seller's costs" constituted "unlawful" conduct under the NJCFA.  58 N.J. at 530.  The trial court

determined that the NJCFA did not prohibit unconscionable business practices, which at the time

was "not mentioned by name in Section 2 of the Consumer Fraud Act."  Id. at 652.  In reversing

21

the trial court, the New Jersey Supreme Court held that deception is not a component of unconscionability, but rather, unconscionability is so deplorable that, like deception, it was always independently actionable under the NJCFA:

> The standard of conduct contemplated by the unconscionability clause is good faith, honesty in fact and observance of fair dealing. . . .  [A] material departure from the standard puts a badge of fraud on the transaction and here the concept of fraud and unconscionability are interchangeable. Thus we believe that in consumer goods transactions such as those involved in this case, unconscionability must be equated with the concepts of deception, fraud, false pretense, misrepresentation, concealment and the like, which are stamped unlawful under N.J.S.A. 56:8-2.  We do not consider that absence of the word 'unconscionable' from the statute detracts in any substantial degree from the force of this conclusion. That view is aided and strengthened by the plain inference that the Legislature intended to broaden the scope of responsibility for unfair business practices by stating in Section 2 that the use of any of the described practices is unlawful 'whether or not any person (the consumer) has in fact been misled, deceived or damaged thereby.'

Id.

Indeed, the Kugler court's understanding of the breadth of NJCFA proved prescient, as "unconscionable commercial practice[s]" were later explicitly prohibited by the statute.  L. 1971, c. 247, § 1; Cox v. Sears Roebuck & Co., 138 N.J. 2, 15 (1994).

**B.  Plaintiff Need Not Plead "Substantial Aggravating Circumstances"**

   **(Responding to Def.'s BR, p. 13)**

Defendant's attempt to graft a requirement of "egregious conduct" onto all NJCFA claims also misfires.  A showing of "substantial aggravating circumstances," is only applicable in breach of warranty or breach of contract cases.  Cox v. Sears Roebuck & Co., 138 NJ 2, 18, (1994).  Plaintiff Ciser's challenge to Nestlé Waters' exorbitant late fee involves neither. Accordingly, Petri Paint Co., Inc. v. OMG Americas, Inc., 595 F. Supp. 2d 416, 421 (D.N.J. 2008), and Papoutsakis v. Bank of Am., No. 10-2147 (SDW), 2011 WL 221703 (D.N.J. Jan. 20, 2011) do not counsel dismissal of Plaintiff's claims.

Even if consumers alleging unconscionable conduct were uniformly required to show substantial aggravating circumstances, which they are not, Plaintiff Ciser succeeds in showing the Water Company's conduct is especially egregious in charging penalties more than 100% of the base payment due from water delivery customers like Mr. Ciser.

### C.  Plaintiff Ciser is not Challenging the Price of Nestlé Waters' Product (Responding to Def.'s Br. Point I)

Defendant's contention that Plaintiff is merely a dissatisfied customer is absurd.  Indeed, Defendant's position provides a glimpse behind the curtain as to how Nestlé Waters views its customers.  Plaintiff Ciser's Second Amended Complaint clearly demonstrates the significant public harm caused by Defendant's late fee, harm that is much more than mere inconvenience. The company charges its customers a late fee no matter how large the late fee is relative to the amount of the overdue payment, or how many days overdue the payment might be.  2d Am. Compl. ¶ 3.  Many of these fees equate to percentages of 50% of the outstanding amount owed. Id. ¶ 9.  And in one instance, Plaintiff was charged a fee that constituted 132% of the overdue amount.  Id. ¶¶ 2-3.  The fee is not for the purpose of offsetting the marginal cost of a late payment, but rather to enrich Defendant at the expense of unsuspecting consumers.  Id. ¶¶ 9, 51-54.  Indeed, Plaintiff Ciser alleges that Defendant's actual or anticipated late payment costs are "barely over $1 (if that)."  Id. ¶ 6(iv).  Nestlé Waters also has, by far, the highest late fee of any comparable company.  Id. ¶¶ 38-41.  Moreover, its billing practices are inconsistent and confusing, and its invoices are unclear.  Id. ¶ 44.  Taken as true, Plaintiff's allegations provide sufficient evidence of unlawful conduct.

The cases Nestlé Waters cites in its brief require the same conclusion.  Def.'s Br. 5, 8, 13, 19.  In Optica, Inc. v. Metro Pub. Adj., Inc., Judge Rodriguez found the NJCFA inapplicable to a one-off insurance dispute because the case did not involve practices that "will victimize the

average consumer, and thus [do not] directly involve a matter of legitimate public concern."  No. 03-5065 (JHR), 2005 WL 1719134, at *16 (D.N.J. July 21, 2005).  The same cannot be said of Nestlé Waters' late fee, which affects thousands, if not millions, of customers.  As set forth in the Second Amended Compliant, "Nestlé Waters claims to be the largest bottled water company in the United States, with 41% of the bottled water market."  2d Am. Compl. ¶ 3.

    Turf Lawnmower Repair, Inc. v. Bergen Record Corp., 139 NJ 392 (1995) also provides no succor to 'Defendant, as Judge Cooper noted, "that case involved a libel claim, rather than a claim for unconscionable commercial practices under the NJCFA."  Katz v. Live Nation, Inc., No. 09-3740 (MLC), 2010 WL 3522792, at *6 (D.N.J. Sept. 2, 2010).

    Nestlé Waters' heavy reliance on Hassler v. Sovereign Bank, 644 F.Supp.2d 509, 514 (D.N.J. 2009) (passim in its brief) and Probola v. Long & Foster Real Estate, Inc., A-3923-11T3, 2013 WL 163322 (N.J. Super. Ct. App. Div. Jan. 16, 2013) (Def.'s Br. 9, 13) are similarly misplaced.  These cases dealt with challenges to the adequacy and completeness of the defendants' fee disclosures.[6]  This is not a disclosure case, and those cases are obviously not pertinent to this Court's analysis.  Accordingly, even assuming Defendant's unconscionable fee was disclosed on its website and bills, such disclosure finds no resonance to the claims at issue challenging the profit scheme underlying the late fee charges.  Def.'s Br. 9-10.

    Nestlé Waters also improperly relies on Quigley v. Esquire Deposition Servs., LLC, a case where the plaintiff merely complained that he had been overbilled for deposition transcripts vis-a-vis his own "reasonable expectation" of what those deposition transcripts would look like

---

[6] Plaintiff is also surprised at Nestle Waters' citation of Hassler given the fury with which Defendant has previously protested Plaintiff's citation of non-binding precedent. Def.'s Reply Br. 9-10, ECF No. 14.  As this Court recently noted, Hassler is "not regarded as precedent[] that bind[s] the court"  Hughes v TD Bank, N.A., 856 F Supp 2d 673, 678 (D.N.J. 2012) (quoting Grau v. New Kensington Arnold School Dist., 429 Fed.Appx. 169, 171 n.3 (3d Cir. 2011)).

and how much they would cost.  409 N.J. Super. 69, 78 (N.J. App. Div. 2009).  <u>Quigley</u>, however, did not concern allegations that the defendant's fee was an impermissible liquidated damages clause.  The cases that address that issue – <u>Kings Choice</u> and <u>New York Career Guidance Services</u> – are conspicuously absent from Defendant's brief.

Instead, Defendant relies on <u>Quigley</u> for the notion that capitalism permits it to saddle its customers with the highest possible late fee.  Def.s Br. 10-11.  This argument, however, was dismissed by the New Jersey Supreme Court more than 40 years ago:

> The intent of the [unconscionability doctrine] is not to erase the doctrine of freedom of contract, but to make realistic the assumption of the law that the agreement has resulted from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion. Viewed in that sense, freedom to contract survives, but marketers of consumer goods are brought to an awareness that the restraint of unconscionability is always hovering over their operations and that courts will employ it to balance the interests of the consumer public and those of the sellers.

<u>Kugler v Romain</u>, 58 NJ 522, 543-44 (1971).

It is telling that Nestlé Waters' only actual defense of its flat $15 late fee is to invoke capitalism.  Defendant, despite its numerous impermissible arguments, does not explain how it arrived at its $15 fee, nor how $15 is consumed by the cost of its auto-generated reminder and an occasional dunning letter.  Indeed, the water company does not even bother to indicate what percentage of late payments generate a dunning letter.  Rather, Defendant seeks to borrow the robes of the free market by characterizing its liquidated damages clause as a component of price.  Liquidated damages, however, have been treated separately from price for centuries.  <u>See</u> <u>Wasserman's Inc. v. Twp. of Middletown</u>, 137 NJ 238, 248 (1994) (Because penalty clauses "carr[y] an unusual danger of oppression and extortion, . . . [f]or more than five centuries, courts have scrutinized contractual provisions that specify damages payable in the event of breach.") (internal citations and quotation marks omitted)).  Without more, Defendant's defense of its late

fee boils down to a half-baked political theory: that the market will correct all unconscionable conduct.  This argument, however, is one for the meeting hall, not the courts.

## VI.   THE "VOLUNTARY PAYMENT" DOCTRINE DOES NOT FORECLOSE PLAINTIFF CISER'S CLAIMS

**(Responding to Point V in Def.'s Br., pp. 24-36)**

### A. The Voluntary Payment Doctrine Does Not Apply in New Jersey Consumer Protection Actions

The voluntary payment doctrine is a rarely-used equitable doctrine "developed to limit the circumstances in which a party can be forced to repay funds that it has already received.  The rule generally provides that when a person has voluntarily overpaid another party, particularly a government agency, that person may not obtain a refund of the excessive amount, absent a showing of fraud, duress, extortion, mistake of fact, or some other special justification."  Smith v Hudson County Register, 411 N.J. Super. 538, 552 (App. Div. 2010); see also, e.g., Cont'l Trailways, Inc v.  Director, Div. of Motor Vehicles, 102 N.J. 526, 548-550 (1986) (noting that the public policy behind the voluntary payment rule was to discourage suits for the refund of taxes erroneously paid or illegally collected because of the fiscal budgeting practices and procedures of public entities).

Each of Defendant's New Jersey voluntary payment cases involved payments of license fees or taxes made to a governmental entity. Defendant has offered no legitimate reason why payments to the government have any bearing on private commercial transactions or why this governmental affirmative defense should be extended to consumer cases or NJCFA cases. Putting aside for a moment the fact that Nestlé Waters omits from its brief the New Jersey cases that refuse to apply this tax doctrine to dismiss low-value consumer cases (discussed *infra* below), Defendant requests that this Court break with applicable precedent and insulate itself

from any challenge to its bad acts.  Defendant's tired justification for why New Jersey consumers should now be held to have voluntarily paid these spurious charges?  The fine print.

Defendant argues that it can charge late fees that exceed 100% of the amount owed because its invoices sometimes contain a nondescript "reminder notice" to pay owed bills and a painfully small "Billing Rights Summary" on the back side of the invoice.  If a customer is even able to make out the tiny print on the backside of the bill, he would find that the water company is telling him he has only thirty days to complain about the bill *in writing*, and that that without taking written action the customer will lose his rights.  2013 Elliott Decl., Exs. A-B, Dkt. 22-1.[7] This is hardly the warm "invitation" described in Defendant's brief.  Def.'s Br. 34.  In fact, it's the type of one-sided adhesion clause that New Jersey courts have found bars application of the voluntary payment doctrine.[8]

In <u>Smith v. Hudson County Register</u>, Dean Smith and others brought a class action alleging that three defendant New Jersey counties were overcharging for the copying of government records maintained at County offices.  411 N.J. Super. 538, 546 (N.J. Super. Ct. App. Div. 2010).  Like Nestlé, the <u>Smith</u> defendants invoked the voluntary payment doctrine. The <u>Smith</u> court however, did not take the bait:

> Before we examine the merits of these appeals, we address a procedural argument raised by defendants []: namely whether [the] plaintiffs are estopped from challenging the Counties' respective copying charges because they allegedly "volunteered" payment of those charges. **We reject that argument, essentially because it misconceives the adhesive setting in which Smith, Gensch, and other citizens obtain photocopied records from the County offices.**

---

[7] Plaintiff Ciser invites the court to view the invoices attached as Exhibits A and B of the Elliot Declaration.  Plaintiff's description of the size of Nestle Waters' adhesive language as "painfully small" only begins to describe how difficult it is for consumers to read the invoice's take it or leave it language.
[8] Defendant also inaccurately contends, Br. 27, 32, that "the front and back sides of each invoice contain a toll-free, customer service number, stating that the customer should '[n]ever hesitate to call us with comments, questions, or concerns.'" (2013 Elliott Decl., Exs. A-B, Dkt. 22-1).   Defendant's customer service number was not included on the back of the invoice until November, 2008.  <u>Id.</u>  Three of the five invoices at issue in this litigation, therefore, do not have a customer service number on the back side.

Id. at 551 (emphasis added); see also Home for Armenian Aged, Inc. v. Symeonidis, A-1048-11T4, 2012 WL 5834373, at *3 (N.J. Super. Ct. App. Div. Nov. 19, 2012) ("a contract of adhesion begins a sharpened inquiry into unconscionability based on factors such as bargaining power, the contract's subject matter, the public interest, and the degree of economic compulsion motivating the adhering' party"); Rudbart v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 356 (1992) ("Thus, in determining whether to enforce the terms of a contract of adhesion, courts have looked not only to the take-it-or-leave-it nature or the standardized form of the document but also to the . . . parties' relative bargaining positions . . . .").

The Smith court continued:

> To be voluntary, a payment must be made with knowledge that there is no compulsion to pay.  Jenkins v. Kaplan, 53 N. J. Super. 582, 588, (App. Div. 1959).  Here, Smith, Gensch and other citizens requesting copies of government records from defendants had no realistic choice but to pay the respective County's stated fee in order to obtain such copies.  The fee was non-negotiable.
>
> Moreover, the record is barren of proof that either Smith or Gensch knew the pertinent County's actual costs of reproduction when they obtained their copies. Although they clearly had a strong suspicion that the fee charged by the County exceeded the actual costs involved, they did not know that for certain.  Plaintiffs may well be "test-case" litigants, but they are not volunteers estopped from obtaining a remedy for a proven government overcharge.
>
> Nor were plaintiffs obligated to lodge a formal protest with the defendant Counties before filing suit. . . .  We suspect that such a formal protest here would have been futile, in light of the Counties' strong and persistent defense, both at the trial level and on the present appeals, of the legality of their copying fees.
>
> For these reasons, we reverse the trial court's application of the voluntary payment rule. . . .

Id. at 553-54.   This court should follow Smith and reject the application of the voluntary payment doctrine to consumer cases.

Other recent New Jersey case law strongly supports this conclusion.  First, the New Jersey Supreme Court held in <u>Bosland v. Warnock Dodge, Inc.</u>, 197 N.J. 543 (2009) that the NJCFA did not require a pre-suit demand for a refund and thus permitted a class of car buyers to recover under the NJCFA for overcharges paid on car registration fees.  Writing for a unanimous Court, Justice Hoens highlighted the public policy rationale underlying both the class action mechanism and the NJCFA:

> When confronted, as we are here, with a plaintiff who asserts that she was the victim of an overcharge which itself is small in amount, and who seeks recovery for herself and on behalf of numerous others with "nominal" claims, we cannot overlook the reality that, without the remedy that the NJCFA affords, all of those wrongs might go unvindicated.  <u>See Local 68</u>, supra, 192 N.J. at 382-85.  As with our view of the rationale that underlies the class action mechanism, <u>ibid.</u>; <u>see Iliadis v. Wal-Mart Stores, Inc.</u>, 191 N.J. 88, 115 (2007) (explaining significance of availability of class actions in context of nominal damages), we see in the NJCFA an underlying public policy rationale that gives no support to the suggestion that a pre-suit demand for a refund is required.

<u>Id</u>. at 561.  The Court admonished: "Indeed, we see in defendant's arguments an effort to import into the NJCFA obstacles that would impede access to the broad remedial protections for consumers that our Legislature so obviously intended to create."  <u>Id</u>. at 559-60.  The Water Company's efforts here are no different.

In fact, when it comes to consumer actions the voluntary payment rule has the same effect as the pre-suit demand requirement.  And as the New Jersey Appellate Division recently illustrated, the outcome of applying either rule in consumer cases significantly harms the consuming public:

> [A] merchant could rely on the pre-suit demand requirement by boldly imposing inflated charges at no risk, and planning to refund the overcharges only when asked.  Here, the judge determined that plaintiff was required to have her attorney demand a refund before commencing suit.  If that conclusion was correct, the NJCFA would limit relief by making it available only to those consumers who are alert enough to ask for a refund, while allowing the offending merchant to reap a windfall.  To the contrary, the Legislature intended to empower consumers who

seek to secure relief for themselves and for others who may not be aware that they have been victimized.  Because reading a pre-suit demand for refund requirement into the NJCFA would thwart those salutary purposes, we will not endorse it.

Cowger v Cherry Hill Mitsubishi, Inc., A-3408-09T4, 2011 WL 848133, at *4 (N.J. Super. Ct. App. Div. Mar. 14, 2011).

Following the New Jersey Supreme Court's lead in Bosland, a New Jersey District court in Rickenbach v. Wells Fargo Bank, N.A., 635 F. Supp. 2d 389 (D.N.J. 2009), declined to dismiss, under the voluntary payment rule, borrowers' claims that excessive mortgage processing fees violate the NJCFA and other state law. The Rickenbach court's holding rested on the Court's inability to determine whether payment of the fees occurred under mistake of fact, an exception to the volunteer rule.   The Court also observed, citing Bosland, that the NJCFA "appears to conflict with the common law voluntary payment rule, for the NJCFA permits suit based solely on regulatory violations, even in the absence of fraud or duress."  Id. at 395.

In a similar vein, courts across the country have held that the voluntary payment doctrine conflicts with the purposes and policies of protecting consumers.  See Southstar Energy Services, LLC v. Ellison, 691 S.E.2d 203, 206 (Ga. 2010) (collecting cases); Mitchell v. Residential Funding Corp., 334 S.W.3d 477, 500 (Mo. Ct. App. 2010) ("[A]llowing Defendants to present a voluntary payment defense would negate the [Act's] provision for consumer protections. Borrowers could be charged illegal fees, and so long as Defendants listed those fees on closing documents, they would escape liability. This requires the borrower to investigate and inspect each fee before paying it, thereby shifting the burden of complying with the statute to the borrower. Such a reading is wholly inconsistent with the purposes of a consumer protection statute."); Indoor Billboard/Wash. Inc. v. Integra Telecom of Wash., Inc., 162 Wash.2d 59 (2007) ("[T]he voluntary payment doctrine is inappropriate as an affirmative defense in the

[Consumer Protection Act] context, as a matter of law, because we construe the [Act] liberally in favor of plaintiffs."); <u>Ramirez v. Smart Corp.</u>, 371 Ill.App.3d 797 (2007) ("[T]his state has an interest in transactions that violate 'statutorily-defined public policy.' The effect of such transgressive acts, generally speaking, is that the voluntary payment rule will not be applicable."); <u>Pratt v. Smart Corp.</u>, 968 S.W.2d 868, 872 (Tenn. Ct. App. 1997) ("[T]he State has an interest in transactions that involve violations of statutorily defined public policy, and, generally speaking, in such situations, the voluntary payment rule will not be applicable."); <u>Brown v. SBC Communs., Inc.</u>, No. 05-CV-777 (JPG), 2007 WL 684133, at *9, n.3 (S.D. Ill. Mar. 1, 2007) (noting authority for view that remedial legislation is not subject to common-law defenses).

New Jersey courts also have refused to apply the voluntary payment doctrine to claims brought under federal statutes that, like the NJCFA, were designed to protect consumers.  <u>See FTC v. Millennium Telecard, Inc.</u>, No. 11-2479 (JLL), 2011 WL 2745963, at *4 (D.N.J. July 11, 2011) (declining to apply the voluntary payment rule to actions brought under the Federal Trade Commission Act (FTCA), 15 U.S.C. § 53(b), which has a "primary purpose" of "protect[ing] the consumer public"); <u>Scott v. Fairbanks Capital Corp.</u>, 284 F. Supp. 2d 880, 895 (S.D. Ohio 2003) (noting that the voluntary payment doctrine "appears to contradict the plain language" of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692a <u>et seq</u>.).  The FTCA in particular is a model for and closely analogous to state consumer protection laws such as the NJCFA.  <u>D'Ercole Sales v. Fruehauf Corp.</u>, 206 N.J. Super. 11, 29-30 (App. Div. 1985).

Moreover, the inapplicability of the voluntary payment rule to the consumer protection context accords with the New Jersey Supreme Court's disdain of maneuvers that effectively amount to "exculpatory waivers," which are "void as against public policy."  <u>Muhammad v.</u>

County Bank of Rehoboth Beach, Delaware, 189 N.J. 1, 19 (2006) overruled as preempted by the Federal Arbitration Act in AT&T Mobility LLC v. Concepcion, 131 S Ct 1740 (2011).   In Muhammad, the Court refused to enforce a class-action waiver in an arbitration agreement when doing so would have deprived plaintiff of an available mechanism to vindicate her consumer rights.  See also, e.g., Marcinczyk v. State of New Jersey Police Training Com'n, 203 N.J. 586, 598-99 (N.J. 2010) (refusing to enforce exculpatory clause and reiterating their abhorrence under New Jersey law); Lee v. Carter-Reed Co., LLC, 203 N.J. 496 (2010) (reversing denial of class certification in NJCFA case; highlighting importance of class action mechanism in enforcing substantive rights).  As the Seventh Circuit recognized in Carnegie v. Household Int'l Inc., 376 F.3d 656 (7th Cir. 2004): "The realistic alternative to a class action is not 17 million individual suits but zero individual suits, as only a lunatic, or a fanatic sues for $30."

Such public policy concerns certainly govern the scope and applicability of the voluntary payment rule here.  Indeed, it strains logic to conclude that the New Jersey Supreme Court would allow the voluntary payment doctrine to eviscerate the NJCFA, given Muhammad and existing case law emphasizing the Act's broad sweep and remedial purposes. See, e.g., Bosland, supra at 553-55; Real v. Radir Wheels, Inc., 198 N.J. 511, 514 (2009); Jefferson Loan Co., Inc. v. Session, 938 A.2d 169, 178 (N.J. Sup. Ct. App. Div. 2008); Assocs. Home Equity Servs., Inc. v. Troup, 343 N.J. Super. 254, 278 (App. Div. 2001).

These and other cases repeatedly emphasize that the NJCFA's purposes are not to be frustrated by a "crabbed" interpretation or by importing obstacles not contained within the Act itself.  The voluntary payment doctrine should not be applied to trump the strong public policies embodied in the NJCFA and insulate Nestlé Waters from liability for its mass wrongdoing.  A contrary conclusion would be "illogical and inequitable."   Eisel v. Midwest BankCentre, 230

S.W.3d 335, 340 (Mo. 2007) (En Banc); <u>see also</u> <u>Partell v. Fid. Nat. Title Ins. Services</u>, No. 12-CV-376s (WMS), 2012 WL 5288754, at *7 (W.D.N.Y. Oct. 24, 2012) ("[I]f this Court were to adopt [Defendant's] position, insurers could violate the law with impunity, unless the consumer conducted independent research and contested the charge.").[9]

### B. Application of the Voluntary Payment Doctrine Depends on Factual Questions that Cannot Be Decided on a Rule 12(b)(6) Motion

Assuming, *arguendo*, the voluntary payment doctrine were applicable in New Jersey consumer cases, factual questions prevent its application at the pleading stage.

As the court in <u>Carducci v. Aetna U.S. Healthcare</u> held:

> The voluntary payment doctrine, thus, only prevents restitution of amounts previously paid if (1) the payment was voluntarily made, (2) the payor was not under any mistake of fact, and (3) the circumstances of the payment were proper. **All are factual questions.**

247 F. Supp. 2d 596, 619 (D.N.J. 2003), <u>overturned on other grounds by</u> <u>Levine v. United Healthcare Corp.</u>, 402 F.3d 156 (3d Cir. 2005) (emphasis added); <u>Simonson v. Hertz Corp.</u>, No. 1:10-CV-1585 (NLH), 2011 WL 1205584, at *3 (D.N.J. Mar. 28, 2011) (same); <u>Rickenbach v. Wells Fargo Bank, N.A.</u>, 635 F. Supp. 2d 389, 395 (D.N.J. 2009) (Simandle, J.) ("[T]he voluntary payment rule cannot be resolved on a motion to dismiss, where the complaint does not establish whether the plaintiff's payment was truly voluntary and made without mistake of fact.").

These considerations preclude dismissal, as nothing in the Second Amended Complaint establishes that Plaintiff Ciser "voluntarily" paid the assessed late fees. To the contrary, Mr.

---

[9] Just as the voluntary payment doctrine is no bar to Ciser's individual claims, federal courts have held that the voluntary payment defense presents no bar to class certification. <u>See, e.g.</u>, <u>Pro v. Hertz Equip. Rental Corp.</u>, No. 06-3830 (DMC), 2009 WL 1010622, at *3 (D.N.J. Feb. 3, 2009); <u>Hill v. Galaxy Telecom L.P.</u>, 184 F.R.D. 82, 87 (N.D. Miss. 1999).

Ciser's allegations raise important factual issues, and bar application of the doctrine (if even applicable) at this juncture.

Mr. Ciser alleges that "due to [Defendant's] confusing billing practices, he was thus mistaken when paying his bills, including the late payments. Further, Mr. Ciser relied on Defendant's good faith, and had no reason to believe when he made his payments which included assessments for late charges in 2006-09 that the company's late charges were not reasonably related to Nestlé's actual and anticipated costs attributed to late payment.  Plaintiff Ciser felt compelled to pay his entire bills, including the late fees."  2d Am. Compl. ¶ 45.

The Water Company's bills were confusing because Defendant often had a lag of a month or more before listing the fee on Plaintiff's invoices.  <u>Id.</u> ¶ 44.  And when the fee was listed on the invoice, Defendant did not indicate to which overdue payment the late fee applied. <u>Id.</u>  As a result, when Plaintiff Ciser made his payments, he was unable to ascertain to which payment the late fee applied.  <u>Id.</u>

Indeed, only with the assistance of a noted business Professor was Plaintiff and his counsel able to ascertain which overdue payments triggered Defendant's $15 penalty.  In fact, due to Defendant's complicated billing practices, there is still a question as to the applicable overdue payment for one the late fees assessed against Plaintiff Ciser.  <u>Id.</u>  In light of these allegations, it is far from "apparent from the face of the Complaint" that Plaintiff Ciser voluntarily paid Defendant's fees.  Def.'s Br. 24.

### C. Allegations in the Second Amended Complaint Show that Defendant's Misdeeds Will not be Excused by the Voluntary Payment Doctrine

The Second Amended Complaint contains ample facts showing that the voluntary payment doctrine does not bar Plaintiff's claims.  First, persuasive authority from this district shows that Ciser's payments were not "voluntary."  In <u>Agostino v. Quest Diagnostics, Inc.</u>, Janet

Grandalski was billed four $30 invoices – each made up of a $20 payment and a $10 "collection fee."  No. 04-4362 (SRC), 2011 WL 5410667, at *1 (D.N.J. Nov. 3, 2011).  Ms. Grandalski paid the invoices and subsequently joined a class action.   Id.   In rejecting the Quest defendants' voluntary payment defense, Judge Chesler held as follows:

> In their opposition briefs, Defendants cite to case law which stands for the proposition that voluntary overpayment need not be refunded.  However, as those cases explain, "fraud, duress, extortion or mistake of fact" vitiate the "volunteer rule."  See New Jersey Builders Assoc. v. Borough of Mendham, 263 N.J.Super. 88 (App. Div. 1993).  Plaintiffs have satisfied their burden at summary judgment by pointing to the absence of evidence to support the Defendants' defense.  Here, **Mrs. Grandalski erroneously believed she was required to pay the entirety of the invoices she received, and operated under the threat that refusal to pay could show up on a credit report.  Thus, Defendants have not demonstrated that the paid administrative fees were truly voluntary.**  Therefore, Mrs. Grandalski's motion for summary judgment on her unjust enrichment claim will be granted and Defendants' motions will be denied.

Id.  (emphasis added).  Like Ms. Grandalaski, Ciser alleges that he felt compelled to pay the fees and that he had no reason to believe that he was being overcharged.  2d Am. Compl. ¶ 45.  Accordingly, and in light of Ciser's allegations, it cannot be determined as a matter of law that Plaintiff Ciser paid the late fees voluntarily.  As Quest makes clear, this question is unsuitable even for summary judgment, much less a motion to dismiss.

Second, Mr. Ciser alleges that he made his payments that included the late charges under a mistake of fact.  2d Am. Compl. ¶ ¶ 43-45.  These allegations thus preclude application of the voluntary payment doctrine  as this Court recently held in Shinn v. Champion Mortg. Co., Inc., No. 09-CV-00013 (WJM), 2010 WL 500410, at *9 (D.N.J. Feb. 5, 2010) (Martini, J.), ruling that:

> "to the extent that Defendant charged Plaintiffs for expenses beyond those actually incurred, Plaintiffs certainly did not have full knowledge of the facts. . . . The voluntary payment rule would not affect Plaintiffs' ability to recover fees paid that exceeded contractual limitations, because Plaintiffs were also operating under a mistake of fact that was allegedly propagated by Defendant.

See also 70 C.J.S. Payment § 113 (1987) (There is no payment under a mistake of law where the law is dependent on the facts and the facts are in dispute.); Simonson v. Hertz Corp., No. 1:10-CV-1585 (NLH), 2011 WL 1205584, at *3 (D.N.J. Mar. 28, 2011) ("If Plaintiff was aware the $10.00 fee included [excessive] charges [], he may never have paid the fee. This mistake of fact, if true, would preclude the voluntary payment doctrine."); Partell v. Fid. Nat. Title Ins. Services, No. 12-CV-376s (WMS), 2012 WL 5288754, at *8 (W.D.N.Y. Oct. 24, 2012) (Voluntary payment doctrine not applicable where "[t]here is nothing in the pleadings to suggest that the [Plaintiffs] knew that the correct rate was actually half of the rate they were charged, but paid it regardless.).

Moreover, while Plaintiff Ciser believes the $15 fee to be excessive and unlawful, he has no way of definitively knowing until discovery ferrets out whether Defendant's late fees failed to bear any rational relationship to the actual marginal costs associated with the Water Company's overdue payment.  As alleged in the Second Amended Complaint, when Ciser paid the fee he did not know that the Defendant's late charges were for its profit margins and not reasonably related to the actual and anticipated costs attributable to late payment.  2d Am. Compl. ¶¶  44-45.  This fact alone precludes the application of the voluntary payment doctrine. Shinn, 2010 WL 500410, at *9.

Two additional alleged facts (¶44) further gut any application of the voluntary payment defense.  Defendant's invoices did not indicate which overdue payment triggered the late fee, and they often had a lag of a month or more before listing the fee.  Id., 2010 WL 500410, at *9 ("because Defendant never itemized the charges, it does not appear to the Court that Plaintiffs had full knowledge of the facts when they made payments to Defendant.").

## VII.    FED. R. CIV. P. 9(b) DOES NOT REQUIRE DISMISSAL OF PLAINTIFF'S NJCFA CLAIMS

**(Responding to Def.'s Br. Point IV, pp 21-23)**

**A. Rule 9(b) Does Not Apply to the CFA Count Because Plaintiff's Claims Do Not "Sound in Fraud"**

While Plaintiff of course does not dispute that under Fed. R. Civ. P. 9(b), a party alleging fraud must meet a heightened standard of pleading fraud with "particularity," the standard has no application to Mr. Ciser's NJCFA claims. Mr. Ciser's allegations don't "sound in fraud." As set forth in detail above, Plaintiff alleges that Defendant Nestlé's imposition of an unreasonably high late fee is an "unconscionable commercial practice" under the NJCFA. 2d Am. Compl. ¶ 51.

Third Circuit cases establish that where statutory causes of action do not necessarily involve fraud, courts must examine the specific allegations of a complaint to determine whether particular counts are "grounded in fraud." See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 269-274 (3d Cir. 2006). Claims brought under the NJCFA do not require an allegation of fraud. To the contrary, the Act defines unlawful conduct in the *disjunctive* as "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, *or* the knowing[] concealment, suppression, or omission of any material fact." N.J.S.A. 56:8-2 (emphasis added); see also Cox, 138 N.J. at 17-20; State v. Hudson Furniture Co., 165 N.J. Super. 516, 520 (App. Div. 1979).

Under the NJCFA, only those claims which "sound in fraud" are subject to the heightened pleading requirements of Rule 9(b). See, e.g., Soto v. Quicken Loans, Inc., 2010 U.S. Dist. LEXIS 131913, at *12 (D.N.J. Dec. 14, 2010); Smajlaj v. Campbell Soup Co., 782 F. Supp. 2d 84, 98 n.9 (D.N.J. 2011); Dewey v. Volkswagen, 558 F. Supp. 2d 505, 524-27 (D.N.J. 2008) (applying Rule 9(b) standard to common law fraud claims and NJCFA claims sounding in fraud, but not unconscionable commercial practice claim).

When a plaintiff alleges unconscionability rather than fraud, Rule 9(b) is inapplicable. A-1 Advanced Moving & Storage Inc. v. Norvergence Inc., 424 B.R. 663, 692-95 (Bankr. D.N.J. 2010); Katz v. Live Nation, Inc., No. 09-3740 (MLC), 2010 WL 2539686, at *3 (D.N.J. June 17, 2010) ("Unconscionable commercial practice claims are distinct from NJCFA claims sounding in fraud, and so the heightened pleading standard of Rule 9(b) does not apply."); In re NorVergence, Inc., 424 BR 663, 692-93 (Bankr. D.N.J. 2010); Payne v. Fujifilm U.S.A., Inc., No. 07-385 (JAG), 2007 WL 4591281, at *10 (D.N.J. Dec. 28, 2007) ("a liberal reading of Plaintiff's Complaint suggests that Plaintiff's NJCFA claim pertains to contractual unconscionability, rather than 'fraud.'  Plaintiff is not required to meet the higher pleading standard for claims alleging fraud."); Porter v Prop. Damage Control Group, Inc., No. 03 CV 5972, 2007 WL 2907403, at *2 (E.D.N.Y. Sept. 28, 2007) (NJCFA unconscionable commercial practice claim not evaluated under 9(b)); see also In re Avandia Mktg., Sales Practices and Products Liab. Litig., MDL 1871, 2011 WL 4007858, at *2 (E.D. Pa. Sept. 7, 2011) ("Claims alleging unfair conduct are assessed under the standard of Federal Rule of Civil Procedure 8, not 9(b). . . .").

Defendant Nestlé offers a number of 9(b) cases, but they have no pertinence to the instant case, since unlike Ciser, the plaintiffs in those cases do allege fraud.  In Arlandson v. Hartz Mt. Corp., 792 F. Supp. 2d 691, 710 (D.N.J. 2011), plaintiffs brought a class action lawsuit against a manufacturer of flea and tick treatments that alleged fraudulent marking and advertising.  Dist. 1199P Health & Welfare Plan v. Janssen, L.P., 784 F. Supp. 2d 508, 513 (D.N.J. 2011), is also inapposite, as the plaintiffs there brought a class action alleging that the Defendant illegally promoted the drug Risperdal for off-label purposes through a fraudulent and deceptive marketing program.  In Szczubelek v. Cendant Mortgage Corp., No. Civ. 00-2858

(SSB), 2001 WL 34875217, at *3 (D.N.J. June 15, 2001) the court applied the pleading requirement of Rule 9(b) to state consumer fraud statute claims based on misrepresentation of appraisal costs.  And in Hassler v. Sovereign Bank, 644 F.Supp.2d 509, 514 (D.N.J. 2009) the plaintiffs challenged defendants' fee disclosures as incomplete and misleading.

Similarly, in a case before Your Honor, Ramon v Budget Rent-A-Car Sys., Inc., the plaintiff brought NJCFA clams under several theories of "unlawful conduct," including that the Defendant's refueling service charge was fraudulent.  No. 06-1905 (WJM), 2007 WL 604795, at *6 (D.N.J. Feb. 20, 2007) (Martini, J.).  Consequently, this Court applied Rule 9(b) to the plaintiff's "bald allegation that Budget knowingly misrepresented material facts relating to the so-called refueling service charge."  Id.  This Court never opined that Rule 9(b) should be applied to NJCFA claims that allege unconscionable commercial practices claims, nor has Plaintiff's counsel found any such case.  To the contrary, Defendant's own cited cases, such as Dewey v. Volkswagen, 558 F. Supp. 2d 505, 524-27 (D.N.J. 2008) (Def's brief, p 23), are consistent with the wealth of precedent that supports Plaintiff's arguments that only where a complaint pleads common law fraud or NJCFA claims sounding in fraud, does 9(b)'s standard apply.

Even if evaluated under a 9(b) standard, Plaintiffs' claims nonetheless easily hurdle Rule 9(b)'s heightened pleading requirements.  The Complaint delves into great detail to describe the unlawful conduct, specifying the circumstances and dates of the late payments, and why the late fee constitutes a penalty.  2d Am. Compl. ¶¶ 19-45. Even if Rule 9(b) Applies, Plaintiffs' Complaint Satisfies the Standard.

## VIII.   PLAINTIFF'S THIRD CAUSE OF ACTION STATES A CLAIM FOR UNJUST ENRICHMENT

### (Responding to Def.'s Point VII, pp. 38-40)

Under New Jersey law, a claim of unjust enrichment has only two essential elements: "(1) that the defendant has received a benefit from the plaintiff, and (2) that the retention of the benefit by the defendant is inequitable." Wanaque Borough Sewerage Auth. v. West Milford, 677 A.2d 747, 753 (N.J.1996) (internal citations omitted); see also In re K-Dur Antitrust Litigation, 338 F. Supp. 2d 517, 544 (D.N.J. 2004). Further, authority is clear that, under an unjust enrichment theory, a party who pays an unlawful penalty may recover as restitutionary damages that segment of the payment which is unreasonably high. In Kutzin v. Pirnie, supra, 124 N.J. 500, 512 (1991), the New Jersey Supreme Court held:

> That if a plaintiff can and does show by proper evidence that the defendant is holding an amount of money as a penalty rather than as compensation for injury, he should be given judgment for restitution of that amount.

In Kutzin, the Court overruled the common-law rule that a defaulting buyer may not recover his deposit, irrespective of the actual damages suffered, and instead adopted the modern approach set forth in section 374(1) of the Restatement (Second) of Contracts, whereby the breaching party is entitled to restitution for any benefit that they conferred by way of part performance or reliance in of excess of the loss caused by the breach. 124 N.J. at 516. Further, the Court noted:

> Although we do not consider the validity or enforceability of a liquidated-damages clause in this case, we are reminded of Professor Corbin's warning: "Penalties and forfeitures are not favored; and calling an outrageous penalty by the more kindly name of liquidated damages does not absolve it from its sin."

Id. at 518 (internal citations omitted).

Thus, relying on Kutzin, New Jersey courts have consistently held that where a party pays a penalty that exceeds reasonable damages, that party may sue to recover the excess as restitution for unjust enrichment. See, e.g., Nohe v. Roblyn Development Corp., 296 N.J. Super. 172, 175 (App. Div. 1997); Van Es v. Honeyleaf Properties, Inc., 253 N.J. Super. 566, 568 (App.

Div. 1992) (a party is entitled to restitution of payments made under a liquidated damages clause, if such payment is unreasonable in light of the anticipated or actual loss caused by the party's breach).

Further, "[a]lmost any kind of case in which the defendant gains from the plaintiff and in which it would be unjust. . . to permit the defendant to retain the gain is a good candidate for restitutionary recovery." Dobbs, Law of Remedies, § 4.1, p. 553 (West. Pub. Co. 1993).

All elements for a restitutionary recovery are present here.  Nestlé profited by its own wrong at the expense of Plaintiff Ciser.  In violation of New Jersey law and public policy, Nestlé assessed its customers impermissible late fee penalties, penalties that were far in excess of the approximately $1 Defendant lost as a result of a late payment.  Plaintiff's allegations therefore amply support an unjust enrichment claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Plaintiff's well-pled Second Amended Complaint should be denied.

Dated:   May 6, 2013
         Armonk, New York


_____/s/_____ _____

Steven L. Wittels (SW-8110)
J. Burkett McInturff (JM-4564)

**LAW OFFICES OF STEVEN L. WITTELS, P.C.**
18 Half Mile Road
Armonk, New York 10504
Telephone: (914) 319-9945
Facsimile:  (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com

*Counsel for Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served via ECF

this 6th day of May, 2013 upon the following counsel of record:

**Jeffrey Garrod**
Orloff, Lowenback, Stifelman & Siegel, P.A.
101 Eisenhower Parkway, Suite 400
Roseland New Jersey 07068-1097
(973) 622-6200
jmg@olss.com

*Attorneys for Defendant*


_____/s/  Steven L. Wittels_____
            Steven L. Wittels